No. 96-663

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

Plaintiff and Respondent,

v.

WESLEY CARTER HUBBEL,

Defendant and Appellant.

APPEAL FROM:   District Court of the Twenty-First Judicial District,
In and for the County of Ravalli,
The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

J. G. Shockley, Victor, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Pam Collins, Assistant Attorney
General; Helena, Montana; George Corn, Ravalli County Attorney,
Hamilton,          Montana

Submitted on Briefs: June 19, 1997

Decided: December 18, 1997
Filed:

_____
Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.


Defendant Wesley Carter Hubbel (Hubbel) was charged with aggravated assault, a felony, after an incident in which he shot his wife, Carole Hubbel.  He filed a motion to suppress evidence seized at his home during a warrantless search on the ground that it violated his constitutional rights.  The District Court for the Twenty-First Judicial District, Ravalli County, denied his motion. A jury subsequently returned a guilty verdict.  Hubbel now appeals the denial of his motion to suppress.  We affirm in part and reverse in part.

We frame the issues as follows:

1.   Was the warrantless search and seizure of evidence on private land leading up to and including the threshold of Hubbel's residence constitutional?

2.   Did the District Court err in holding that Carole Hubbel's 'retroactive consent,' given five months after the police searched and seized evidence inside the Hubbel home, cured an otherwise unconstitutional search and seizure?

FACTUAL AND PROCEDURAL BACKGROUND

During the early hours of November 23, 1995, Hubbel telephoned 9-1-1 to report that he had accidentally shot his wife, Carole Hubbel, and that he was bringing her to Mr. T's, a convenience store and gas station located in Darby, Montana, to meet an ambulance.  Deputy Sheriff Bradford Squires was dispatched to Mr. T's.  Deputy Sheriff Gregory Stewart responded separately as backup.

At Mr. T's, Squires approached the car driven by Hubbel and saw Carole Hubbel sitting on the passenger side, holding her hand over her neck with blood between her fingers.  Hubbel exited the car and walked up to Squires, stating 'Arrest me, I just shot my wife.  Arrest me, arrest me.'  Squires placed Hubbel under arrest.

As Squires escorted Hubbel to his patrol car, Hubbel began spontaneously 'babbling,' stating that he accidently shot his wife in their home, although he gave conflicting statements about the circumstances.  He also described the weapon used as a .357 pistol loaded with .38 special ammunition, and stated that after the incident he threw the gun towards the bathroom.  Squires advised Hubbel of his Miranda rights in accordance with Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and Hubbel requested a lawyer.  However, he later began 'babbling' again and expressed concern for fifteen dogs that he said were in the house.

When Stewart arrived at Mr. T's, he observed that the car driven by Hubbel was parked in the middle of the public road.  He moved it to the side of the road for safety reasons, and in the process saw bloodstains in the passenger's seat area.  He called a

wrecker to have the car hauled to storage.  By then, Hubbel had been arrested and was seated in Squiresþ patrol car.  Although Hubbel was rambling and difficult to understand, Stewart heard Hubbel give Squires his address and comment about numerous dogs in the house.

Squires drove Hubbel to the Ravalli County jail, and then went to the hospital where he questioned Carole Hubbel.  Although seriously injured, Carole was alert and responsive.  Squires then drove back to the jail and asked Hubbel to perform an intoxilizer test, which Hubbel declined.  At no time did Squires or anyone else ask either Carole Hubbel or Defendant Hubbel for permission to search their home or property

In the meantime, Detective Peter Clarkson had arrived at Mr. Tþs and took charge of the investigation. Stewart and he drove in their respective cars to the Hubbel residence, which was approximately 15 to 16 miles away,  to investigate the scene and preserve evidence.

Clarkson and Stewart arrived at the Hubbel residence at approximately 4:40 a.m.  The house was located on property that abutted Highway 93.   They pulled into the driveway and parked 70 to 75 feet from the front door, so as not to disturb evidence.  The place where they parked appeared to be the common parking area used by both visitors and the Hubbels themselves.   The two then proceeded on foot towards the home, which was lit by an outside porch light.  As they approached, they could hear dogs barking.   Clarkson and Stewart both testified that they had no reason to believe that any other person would be at the home.

They walked to the end of the parking area to a spot that appeared to be where the Hubbels parked the vehicle that Defendant Hubbel had driven to Mr. Tþs.  Using flashlights, they observed blood in the leaves and grass in that location. They continued walking to the point where the parking area ends and the sidewalk begins, which was about 30 to 35 feet from the front door.  From that point, they could see gunshot holes in the front door and they observed that some of the wood was missing from around the glass.  Additionally, they saw blood and broken glass on an elevated stoop below the door, as well as a telephone with a severed cord lying next to an overturned chair on the porch.  Once on the porch, they also saw a plastic drinking cup of the type commonly used at bars, some ice cubes, and a blood smear on the door.

Clarkson and Stewart entered the house.  Inside they saw a loose dog and a kitten.  Clarkson locked the dog in the stairwell.  Other dogs were already confined in the kitchen.  They made a 5 to 10 minute sweep through the ground floor area of the home and found a .357 magnum on the floor where Hubbel had said it would be, overturned furniture, disheveled bedding, blood spatters, bullet holes, and a fresh cigarette burn in the carpet.

They exited the house and discussed whether they should obtain a search warrant prior to reentering the house to conduct a more thorough search.  Clarkson telephoned

Ravalli County Sheriff Jay Printz, who for undisclosed reasons determined they would not seek one. Squires then arrived with a camera that Clarkson had requested and the three officers at the scene, Squires, Clarkson and Stewart, entered the house a second time to conduct a thorough investigation. They left the scene at approximately 7:45 a.m., after they had taken photographs and removed the front door and the revolver among other items of evidence. There was no indication that the free dog or kitten had compromised any evidence.

On December 11, 1995, the Ravalli County Attorney filed an information charging Hubbel with aggravated assault, a felony. Hubbel pleaded not guilty. On January 29, 1996, he filed a motion to suppress all evidence seized on the property leading to the house as well as all evidence seized inside the house. The court held an evidentiary hearing on the motion on May 2, 1996, approximately five months after the search. At that hearing, Carole Hubbel testified that if asked, she would have given her consent the night of the shooting for the search and further testified that she now gave her retroactive consent. Since that incident, she has allowed law enforcement personnel into her home to investigate the premises in connection with the shooting incident. Additionally, Carole Hubbel is the sole owner of the house and the property, although Defendant Hubbel, who had been her husband for four and one-half months prior to the shooting incident, also resided at the house.

The District Court denied Hubbelþs motion to suppress. First, with respect to evidence seized outside the home, the court applied the criteria enunciated by the United States Supreme Court in U.S. v. Dunn (1987), 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326, for analyzing þcurtilageþ questions under the Fourth Amendment to the United States Constitution. It held that the area surrounding the home did not fall within the homeþs curtilage, and thus the police could lawfully search it without first obtaining a warrant. It also analyzed the issue under the Montana State Constitution. It applied State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61, and held that because the evidence indicated that the Hubbels did not take any steps to communicate that entry onto the property was forbidden, the Hubbels did not have a reasonable expectation of privacy. Thus, the law enforcement officers were within their authority to enter the property, park within the general parking area, and proceed to the front door. All evidence observed in plain view was admissible.

Second, the District Court held that search and seizure of the evidence within Hubbelþs home did not fall within any of the commonly recognized exceptions to the warrant requirement, such as a search incident to an arrest or exigent

circumstances. In particular, there was no reason for the police to believe that the dogs or any person on the property would destroy the evidence. However, the District Court relied upon dicta in State v. Weaver (Ore.1994), 874 P.2d 1322, and held that Carole Hubbelþs retroactive consent to the police entry justified the warrantless search and seizure of evidence within the house.

The jury trial commenced June 3, 1996, and the jury found Hubbel guilty. Hubbel now appeals the denial of his motion to suppress.

## STANDARD OF REVIEW

The standard of review of a district courtþs denial of a motion to suppress is whether the courtþs interpretation and application of the law is correct. State v. Graham (1995), 271 Mont. 510, 512, 898 P.2d 1206, 1207-08. We review the courtþs findings of fact to determine whether they are clearly erroneous and whether those findings were correctly applied as a matter of law. State v. Siegal (Mont. 1997), 934 P.2d 176, 180, 54 St. Rep. 158, 160-61.

## ISSUE ONE

Was the warrantless search and seizure of evidence on private land leading up to and including the threshold of Hubbelþs residence constitutional?

Hubbel contends that the evidence discovered by the State pursuant to its warrantless entry onto the private property surrounding the house where he lived, including the driveway and walkway leading up to and including the front porch, should be suppressed based upon the Fourth and Fourteenth Amendments to the United States Constitution and Article II, Section 11 of the Montana State Constitution, which protect against unlawful searches and seizures. Hubbel argues that pursuant to State v. Loh (1996), 275 Mont. 460, 914 P.2d 592, because the officers were not legally on the property when they first observed evidence, the plain view doctrine does not apply.

At the outset we note than when analyzing search and seizure questions that specially implicate the right of privacy, we consider and address both Sections 10 and 11 of Article II of the Montana Constitution. Siegal, 934 P.2d at 184. Article II, Sections 10 and 11 of the Montana Constitution provide:

Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Section 11.Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

To determine whether there has been an unlawful search pursuant to Montanaþs

constitution, we look to two factors: (1) whether the person has an actual expectation of privacy that society is willing to recognize as objectively reasonable; and (2) the nature of the stateþs intrusion. State v. Scheetz (Mont. No. 96-358, decided December 5, 1997), slip op. at 10. In Bullock, we analyzed the extent to which a person has a legitimate expectation of privacy on his private property, and held that

in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, þNo Trespassing,þ or similar signs . . . entry by law enforcement officers requires permission or a warrant.

Bullock, 901 P.2d at 75-76 (internal citation omitted.) We explained that þ[w]hat a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.þ Bullock, 901 P.2d at 70 (citing Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582).

In Bullock, the defendant had moved his cabin to a place where it was barely visible from the forest service road, had erected a fence and gate separating his property from the road, and had posted þNo Trespassingþ signs. Additionally, the parties in Bullock stipulated that anyone wishing to enter the property in the past, including members of the Jefferson County Sheriffþs Department, had first requested permission. Bullock, 901 P.2d at 76. Accordingly, in that case, we concluded that the defendantþs expectation of privacy was reasonable. We held that the entry by the law enforcement officers onto the defendantþs property without permission or a warrant constituted an unreasonable search and that the evidence that was gathered thereafter was inadmissible. Bullock, 901 P.2d at 76.

Hubbel contends that Bullock has no bearing on this case. He maintains that the analysis we outlined in Bullock applies only when examining whether a search of private property beyond the curtilage is lawful. He argues that the property leading up to the front door was within the curtilage. He therefore urges this Court to apply a þcurtilageþ analysis, rather than a Bullock analysis, and hold that the warrantless search of his curtilage was unconstitutional. He does not elaborate as to whether this Court should apply the same factors for resolving þcurtilageþ questions under the Montana State Constitution as used by the Supreme Court pursuant to the Fourth Amendment (See Dunn, 480 U.S. at 301), or whether the Court should develop a different method for analyzing that issue.

Hubbel misreads Bullock. In Bullock, we traced in great detail the origins of the concepts of þcurtilageþ and þopen fields.þ We explained the manner in which those

doctrines have seeped into federal constitutional analysis, and the role they currently play in interpreting the reach of the Fourth Amendment to the United States Constitution. Bullock, 901 P.2d at 70-75. As the United States Supreme Court explained in Dunn, the concept of curtilage originated at common law to afford a property owner the same protection under the law of burglary to the area immediately surrounding the dwelling house as it afforded the house itself. Dunn, 480 U.S. at 300. That concept has spilled over into federal constitutional analysis. The Fourth Amendment now extends protection not only to oneþs home but also to the curtilage area immediately surrounding the home. It does not extend protection to open fields. Oliver v. United States (1984), 466 U.S. 170, 178-80, 104 S.Ct. 1735, 1741-42, 80 L.Ed.2d 214, 224-26.

For purposes of analyzing search and seizure questions, the concept of curtilage is thus meaningful only insofar as it is distinguished from open fields, which are afforded no Fourth Amendment protection. However, in Bullock, we declined to follow the United States Supreme Courtþs distinction between the two, and we declined to apply the Dunn criteria to that case. Bullock, 901 P.2d at 71. Instead, based upon our unique constitution and this stateþs strong tradition of respect for individual privacy, we adopted our own analysis for determining when entry by law enforcement officers onto private property requires a warrant or permission. Bullock, 901 P.2d at 71, 75. Based upon Bullock and later cases involving search and seizure, this Court recognizes a legitimate expectation of privacy based upon factors such as the place of the investigation, the control exercised by the person over the property being investigated, and the extent to which the person took measures to shield the property from public view, to communicate that entry is not permitted, or to otherwise protect his property from intrusion. Because we have adopted our own analysis under Montanaþs constitution, the concept of þcurtilageþ is thus meaningless. Accordingly, we apply Bullock to the facts of this case.

We hold that with respect to the property leading to the front door, the Hubbels had no legitimate expectation of privacy that society is willing to recognize as objectively reasonable. The Hubbel property abutted a heavily traveled U.S. highway. In spite of the propertyþs proximity to frequent passersby, the Hubbels did not erect a fence separating their property from the highway, did not place a gate at the entrance to their driveway, did not plant shrubs or bushes to shield their property from public view, and did not post þNo Trespassingþ signs or other signs indicating that entry was not permitted. The walkway from the driveway to the front porch was also unobstructed.

The Hubbels placed no fencing, planting or other enclosure around the home and took no steps to shield the porch from public view or to prevent casual visitors from walking to the front door. The police were thus well within their authority when they drove into the driveway and parked in the general parking area where they observed evidence in plain view. They were well within their authority to proceed on the open walkway to the front door, where they saw yet more evidence in plain view.

We next consider the nature of the Stateþs intrusion. Scheetz, slip op. at 10. In Bullock, the Stateþs invasion was overly intrusive. The officers entered private property that was fenced and gated, ignored posted warnings, and scrutinized areas of the defendantþs homestead that he sought to keep private. Bullock, 901 P.2d at 76. In contrast, the intrusion in this case was minimal. The police simply parked in the general parking area routinely used by other visitors, and, after observing blood evidence on the driveway and bullet holes in the front door, continued walking along the sidewalk to the front porch. They did not ignore posted warnings, hop fences, open gates, or slip through bushes intended to screen the home from view. In short, they did nothing other than what any other casual visitor to the Hubbel residence would do. In fact, Hubbel stated that if the police had parked in the driveway and walked to the front door to sell policemen ball tickets, they would have had a legitimate right to be on the premises.

Under these circumstances, we conclude that the State did not offensively intrude upon the Hubbelsþ privacy. We hold that the entry onto the Hubbelsþ property leading up to and including the threshold of the residence did not require a warrant.

Because Montanaþs unique constitutional scheme affords citizens broader protection of their right to privacy than does the Fourth Amendment to the United States Constitution, we usually need not consider the Fourth Amendment issue. Scheetz, slip op. at 5. (citation omitted.); Bullock, 901 P.2d at 75. However, Hubbel argues that the application of Bullock to the facts in this case renders Montanaþs constitutional right to privacy to be narrower than that afforded by the Fourth Amendment. He maintains that the area from the driveway to the porch falls within the definition of þcurtilageþ enunciated in Dunn, and insists that the Fourth Amendment to the United States Constitution extends protection to that area even if the Montana State Constitution does not.

Hubbel is incorrect on both counts. An application of federal Fourth Amendment analysis leads to the same result. The United States Supreme Court resolves curtilage

questions with reference to four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by.  Dunn, 480 U.S. at 301 (citing California v. Ciraolo (1986), 476 U.S. 207, 221, 106 S.Ct. 1809, 1817, 90 L.Ed.2d 210, 222 (Powell, J., dissenting)).  In this case, as we already elaborated, the area is not enclosed by a fence or shrubbery, and the Hubbels took no steps to screen the porch from passersby or otherwise prevent visitors from observing what was in plain view.  There is no evidence that the area surrounding the home was put to any special use which would indicate that it was intimately connected with the home itself or that the Hubbels reasonably expected that the area should be treated the same as the home itself.

Thus, even under a federal analysis, the area in question does not fall within the þcurtilageþ of the home, and it is not protected by the Fourth Amendment to the United States Constitution.  Montanaþs right of privacy as enunciated in Bullock is not narrower than the federal right.  Indeed, we continue to hold that our constitution affords citizens broader protection to that right than does the Fourth Amendment to the United States Constitution.  Accordingly, we hold that the District Court did not err in denying Hubbelþs motion to suppress any evidence observed and seized within plain view in the parking area, on the walkway, and on the front porch.

ISSUE TWO

Did the District Court err in holding that Carole Hubbelþs þretroactive consent,þ given five months after the police searched and seized evidence inside the Hubbel home, cured an otherwise unconstitutional search and seizure?

Pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and Article II, Section 11 of the Montana Constitution, warrantless searches conducted inside a home are per se unreasonable, þsubject only to a few specifically established and well-delineated exceptions.þ Katz v. United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576,585.  See also State v. Rushton (1994), 264 Mont. 248, 257, 870 P.2d 1355, 1361.  One such exception is when the search is conducted pursuant to a consent that is freely and voluntarily given.  Schneckloth v. Bustamonte (1973), 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860 (citing Bumper v. North Carolina (1968), 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802); State v. Kim (1989), 239 Mont. 189, 196, 779 P.2d  512, 517.  This Court has adopted the þtotality of the circumstancesþ test used by the Supreme Court to determine whether consent is voluntary.  Kim, 779 P.2d at 517 (citing Schneckloth, 412 U.S. at 248-49); Rushton, 870 P.2d at 1361.

In this case, the parties agree that neither Hubbel nor his wife Carole Hubbel gave the officers prior consent to search and seize evidence inside their home. However, five months after the search, at the hearing on the motion to suppress, Carole Hubbel gave her þretroactive consent.þ  Hubbel now urges this Court to reject any notion that a so-called þretroactive consentþ can justify an otherwise illegal search and seizure.  He contends that allowing a person to consent to an otherwise unconstitutional search that has already been conducted would render þthe situation ripe for either improper inducements, misleading statements, or pressure by the police to gain consent after an illegal search has been conducted.þ  For policy reasons, Hubbel urges this Court to hold that consent must be given prior to the search for it to be valid and qualify as an exception to the warrant requirement.   The State, on the other hand, contends that the retroactive consent operates to cure all constitutional infirmities.  It argues that the timing of the consent is simply one fact that should be considered under the þtotality of the circumstancesþ and that this Court should apply the þtotality of the circumstancesþ test to find that Carole Hubbelþs consent was valid.  The State relies heavily upon State v. Weaver (Ore. 1994), 874 P.2d 1322, the case cited by the District Court.  It also points to United States v. Tovar-Rico (11th Cir. 1995), 61 F.3d 1529, 1535-36 and United States v. Gonzalez (11th Cir. 1996), 71 F.3d 819, 828-830 in support of its position.

This Court has had at least two occasions to touch upon the issue of retroactive consent.  One occurred over two decades ago in State v. Keller (1976), 170 Mont. 372, 553 P.2d 1013.  In that case, the sheriff had confiscated the defendantþs truck and had conducted a search without a warrant and without the defendantþs knowledge.  Four days later, while in jail, the defendant signed a written consent form.  Keller, 553 P.2d at 1021-22.  This Court nonetheless held that the evidence seized during the search was inadmissible.  We stated:

> [The sheriff] attempted to remove the taint of illegality by a consent form signed by defendant four days later that does not purport to be retroactive.  Defendantþs signature was obtained after search of the truck while defendant was held in jail in the absence of counsel.  Material obtained from this truck was the subject of the laboratory test and was introduced in evidence over defendantþs objection.  This material was illegally obtained, and its admission in evidence and the expert testimony and laboratory tests concerning it was prejudicial error.

Keller, 553 P.2d at 1021-22 (emphasis added).  Accordingly, although we held that the

consent did not justify an earlier illegal search and seizure, we hinted that if the scope of the consent expressly related back to the search (and if the defendant had been assisted by counsel), the result may have been different. However, that statement was ambiguous and in any event was dicta.

More recently, in Bullock, we again broached the issue. In that case, the defendant had been charged with unlawfully killing and possessing a game animal in violation of õõ 87-3-103 and 112, MCA. Bullock, 901 P.2d at 63. The State argued that even if the police officers had unlawfully entered the property when they viewed the elk the defendant had allegedly killed, the defendant had subsequently consented to the search when he allowed the police officers to inspect the elk and offered to take them to the kill site. Bullock, 901 P.2d at 76. This Court rejected the Stateþs argument, stating that þ[e]ven if [the defendant] consented, it was after the officers wrongfully entered his property and saw the elk.þ Bullock, 901 P.2d at 76 (emphasis added). However, in that case, we reached our decision based upon our conclusion that the consent flowed from the unlawful entry and therefore could not be used to justify it. Bullock, 901 P.2d at 76. In this case, Hubbel does not contend that Carole Hubbelþs þconsentþ was the product of the unlawful entry. Additionally, in Bullock, it does not appear that the defendant expressly stated that he intended his consent to apply retroactively. We thus view the precise issue before the Court today to be one of first impression in Montana.

At the outset, we reject the Stateþs proposal that a þtotality of the circumstancesþ test should be used to determine the validity of the þretroactive consent.þ That test is used when determining whether or not a consent was voluntarily and freely given. Kim, 779 P.2d at 517 (citing Schneckloth, 412 U.S. at 248-49); Rushton, 870 P.2d at 1361. In this case, Hubbel does not contend that Carole Hubbelþs þconsentþ was the product of duress or coercion. Rather, what is at issue is the timing of the consent, and whether, as a matter of law, a consent can justify an earlier unconstitutional search if the person giving the consent so intends.

Because the voluntary nature of Carole Hubbelþs þconsentþ is not at issue, two cases cited by the State in support of its position, Gonzalez and Tovar-Rico, are inapposite. At issue in both cases was whether or not the consent was freely given, not whether a retroactive consent validated an earlier unconstitutional search and seizure of evidence. See Gonzalez, 71 F.3d at 829-30 (deciding whether the policeþs illegal

entry
into the ownerþs kitchen should be deemed coercive activity that affected the ownerþs later consent to search other parts of the premises); Tovar-Rico, 61 F.3d at 1535-36 (deciding whether the defendantþs initial oral consent to enter the apartment and her subsequent written consent to conduct a thorough search were voluntary).

The only cited case that addresses the precise issue is Weaver. In that case, the Oregon Supreme Court held that the timing of the consent in and of itself was not dispositive. Instead, relying on the proposition that the consenting party is the person who determines the scope of the consent, the court stated in dicta that a consent could retroactively validate a search or seizure that would otherwise be unlawful if evidence indicates that the consenting party so intended. Weaver, 874 P.2d at 1327-28. However, in that case, no evidence indicated that the defendant intended his consent to retroactively apply to the earlier search. The evidence seized by the police was thus suppressed. Weaver, 874 P.2d at 1328.

Not surprisingly, there is a dearth of cases in other jurisdictions that have addressed the precise issue before this Court today. We review those cases located to glean insight to the issue. Just as the Weaver court in Oregon, at least two other jurisdictions have held or implied that a consent can justify an earlier unconstitutional search. See State v. Kimble (La. 1979), 375 So.2d 924, 927 (holding that ownerþs after-the-fact consent to search and seize evidence in a vacant trailer that incriminated defendants constituted a waiver of the warrant requirement.); State v. Williams (La. 1977), 353 So.2d 1299, 1303-05 (holding that the defendantþs subsequent, written consent, given with the full knowledge that the police had previously entered his house without a warrant, amounted to a waiver of the warrant requirement and rendered the earlier search and seizure valid), cert. denied, 437 U.S. 907 (1978); Martin v. United States (D.C. 1989), 567 A.2d 896, 906 n. 23 (þWe assume without deciding (since the point has not been briefed or argued) that consent . . . can be retroactive, provided that the person giving the consent intends it to be retroactive.þ).

On the other hand, we also located cases that, although distinguishable from this case to varying degrees, all fairly stand for the proposition that a consent must precede a search and seizure for it to provide a valid exception to the warrant requirement. See U.S. v. Wilson (5th Cir. 1994), 36 F.3d 1298, 1304-05 (holding that evidence was inadmissible because it was not within the scope of defendantþs oral pre-seizure consent

to a cursory visual inspection and the seizure was conducted þprior to, not pursuant to [the defendantþs] written consentþ to conduct a complete search)(emphasis in original); United States v. Melendez-Gonzalez (5th Cir. 1984), 727 F.2d 407, 414 (rejecting the argument that a written consent form which þsimply came too lateþ vitiates a prior illegal search, because þ[t]here is no authority which justifies an earlier illegal search based upon a later consent to an additional search.þ ); Mickelson v. State (Wyo. 1995), 906 P.2d 1020, 1022 (stating that efforts to establish consent after an illegal entry þran afoul of the proposition that such action must be 'justified at its inception.'þ)(citing Terry v. Ohio (1968), 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905); People v. Thiret (Colo. 1984), 685 P.2d 193, 201 (holding that a search exceeded the scope of the initial oral consent and was not validated by a subsequent written consent: þAn allegedly consensual seizure must stand or fall on the basis of the consent pre-existing the seizure.þ).

Unfortunately, the cases cited provide little or no analysis to assist us. However, it is our opinion that the conclusion reached in the latter cases reflect the better view: to be valid and qualify as an exception to the warrant requirement, a consent must precede a search.

A search validated by a þretroactive consentþ is not really a search conducted pursuant to a consent at all. Rather, at the moment of inception, the search is unlawful and unjustified. In Montana, we jealously guard our broad right of privacy. Scheetz, slip op. at 6, 8 ; Siegal, 934 P.2d at 191. However, when the police conduct a search such as the one at issue in this case, they are acting in the absence of any safeguards to that privacy: a neutral, objective court has not made an advance determination of probable cause; no exigent circumstances or any other emergency situation apparent prior to the search exists; and no one with authority has consented to the intrusion. That they subsequently obtain a þconsentþ is merely fortuitous.

The requirement of advance justification, by virtue of a warrant or carefully carved exception, is nothing new. Indeed, it is fundamental and inherent to all search and seizure cases. For example, in another other context not involving the question of the timing of a consent, the United States Supreme Court stated that to be lawful, a search and seizure must be justified from the beginning. In Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court evaluated the circumstances under which a police officer may search an individual for hidden weapons during the course

of an investigation without running afoul of the Fourth Amendment. The Supreme Court stated that the search must be justified based upon the facts available to the officer at the moment of the seizure. Terry, 392 U.S. at 21-22. The officerþs actions must be þjustified at its inception. . .þ. Terry, 392 U.S. at 20. The Supreme Court further cautioned that when practicable, the police must þobtain advance judicial approval . . . through the warrant procedure.þ Terry, 392 U.S. at 20. See also State v. Stubbs (1995), 270 Mont. 364, 369, 892 P.2d 547, 550 (citing Terry and stating that a stop and frisk must be þjustified at its inception.þ), overruled on other grounds, 914 P.2d 592. In Montana, since we first adopted the plain view doctrine in 1973 until today, a fundamental requirement has been that the police officers have prior justification to search a protected area. See State v. Loh (1996), 275Mont. 460, 471-73, 914 P.2d 592, 599-601 (generally tracing Montana case law regarding the plain view doctrine). Exigent circumstances for conducting a warrantless search are þthose circumstances where it is not practicable to secure a warrant.þ State v. McCarthy (1993), 258 Mont. 51, 57, 852 P.2d 111, 114-15. It is axiomatic that the exigent circumstances, such as mobile vehicle, possible destruction of evidence, safety of police officers or other emergency situation, be apparent at the inception of the search.

Additionally, requiring prior consent is the only view that makes sense in light of the purposes behind the suppression rule. The rule excluding illegally obtained evidence serves primarily to deter lawless police conduct. Terry, 392 U.S. at 12 (citations omitted). Allowing an after-the-fact þconsent" to justify an otherwise lawless search and seizure would erode the suppression ruleþs deterrent force. This is particularly true in cases where the police do not have probable cause to obtain a warrant. In such a case, the police have nothing to lose. An unlawful intrusion may be viewed as expedient on the off-chance that someone with authority will later þconsent.þ

In this case, the police officers did not obtain consent prior to their search. At least one officer apparently believed that a warrant was required. However, rather than seek prior judicial approval, they chose instead to intrude into the privacy of the Hubbel home. We hold that their entry without a warrant and without prior consent violated Article II, Section 11 of the Montana State Constitution and evidence gathered as a result of the unlawful search was inadmissible by virtue of the exclusionary rule. See Wong Sung v. United States (1963), 371 U.S. 471, 486-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455. We accordingly hold that the District Court erred when it held that Carole Hubbelþs

þretroactive consentþ validated the search.
Affirmed in part, reversed in part, and remanded for further proceedings consistent
with this opinion.

/S/   WILLIAM E. HUNT, SR.


We Concur:

/S/   J. A.   TURNAGE
/S/   JAMES C. NELSON
/S/   W. WILLIAM LEAPHART
/S/   TERRY N. TRIEWEILER