No. 97-335

## IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 6

STATE OF MONTANA,

      Plaintiff and Respondent

v.

TRAVIS McLEES and
CHAD AARON JULIUS,

      Defendants and Appellants.



APPEAL FROM:   District Court of the Fifth Judicial District,
                     In and for the County of Madison,
                     The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Jack H. Morris, Jardine & Morris, Whitehall, Montana

      For Respondent:

           Joseph P. Mazurek, Montana Attorney General, Patricia J. Jordan,
           Assistant Montana Attorney General; Robert R. Zenker, Madison
           County Attorney, Virginia City, Montana

Submitted on Briefs: June 3, 1999

Decided: January 11, 2000

Filed:

_____
               Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1    Appellant Travis McLees, (Travis) appeals from the Order of the District Court of the Fifth Judicial District of the State of Montana, Madison County, denying his motion to suppress evidence and admitting evidence obtained in a search of Travis's apartment. We reverse.

¶2    Did the District Court err in denying Travis's motion to suppress evidence obtained when his grandfather consented to the warrantless search of Travis's apartment?

## FACTUAL BACKGROUND

¶3    On November 25, 1995, the Madison County Sheriff's Department received reports of two burglaries and thefts. Chief Deputy Sheriff, Merlin Ehlers (Deputy Ehlers) investigated the break-ins, one at the Harrison school, the other at the studio of Michelle Walker in Harrison, Montana. Travis had been at Walker's studio the day before to deliver wooden doll bases his father had made for her. Walker indicated that while in her studio, Travis had paid an unusual amount of attention to a stereo which was now missing. At the time, Travis also had a pending charge in Gallatin County for the burglary of a Three Forks school and was known to have broken into the Harrison school when he was a student there.

¶4    Deputy Ehlers went to the home of Travis's mother, Jennifer Flesch (Flesch), in Pony, Montana. Flesch told Deputy Ehlers that Travis was living with his grandfather Earl McLees (Earl) in Three Forks, Montana. Deputy Ehlers had known Earl for years and had been to

2

Earl's home before on personal business. On November 26, 1995, Deputy Ehlers went to Earl's residence at 55 Frontage Road, in Three Forks, to look for Travis.

¶5    Upon arriving at Earl's residence, Deputy Ehlers asked whether Travis was staying there. Earl informed Deputy Ehlers that Travis was living in the apartment which Earl owned next door at 59 Frontage Road. Earl told Deputy Ehlers that Travis had slept in the apartment the night before but had left that morning. Deputy Ehlers did not have a search warrant but asked Earl if he could look in the apartment for possible evidence of the Harrison school burglary. Earl and Deputy Ehlers went to the front door of the apartment, but found it locked. Because Earl did not have a key to the front door, he and Deputy Ehlers went around to the shop which adjoined the apartment from the rear. The two then entered the apartment through an unlocked door leading from the shop to the apartment.

¶6    Upon entering the apartment, Deputy Ehlers noticed some drug paraphernalia and what he believed to be items taken from the Harrison school. Ehlers then telephoned the Gallatin County Sheriff's Office to have them send out an officer from that jurisdiction. Three Forks Marshall, Keith King (Officer King) responded to the scene and entered the apartment. At that time, Officer King and Deputy Ehlers discussed whether they should have a search warrant. Officer King returned to his office in Three Forks where he called the Gallatin County Attorney's office and received the opinion that based on Officer King's description of the situation, a consent search would be sufficient. During Officer King's absence, Deputy Ehlers stayed at the apartment to secure the site.

3

¶7     Officer King returned to the apartment with a consent-to-search form, which Earl signed. Deputy Ehlers and Officer King then searched and photographed the apartment, and seized several items of evidence. A few days later, Deputy Ehlers returned without a warrant, and Earl again allowed him to enter the apartment. A warrant for Travis's arrest was issued on November 30, 1995, and Travis was arrested several months later. Reserving the right to appeal the denial of his motion to suppress, Travis pleaded guilty to two counts of burglary, two counts of theft, and one count of criminal mischief.

¶8     Did the District Court err in denying Travis's motion to suppress evidence obtained when his grandfather consented to the warrantless search of Travis's apartment?

¶9     The standard of review of a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Siegal* (1997), 281 Mont. 250, 257, 934 P.2d 176, 180 *(overruled in part by State v. Kuneff, 1998 MT 287, 291 Mont. 474, 970 P.2d 556)*.

¶10    "[W]arrantless searches conducted inside a home are *per se* unreasonable, 'subject only to a few specifically established and well-delineated exceptions.'" *State v. Hubbel* (1997), 286 Mont. 200, 212, 951 P.2d 971, 978 (citing *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed. 2d 576, 585). "One such exception is when the search is conducted pursuant to a consent that is freely and voluntarily given." *Hubbel*, 286 Mont. at 212, 951 P.2d at 978 (citing *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860). "[W]hen the prosecution seeks to justify a

4

warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *State v. Sorrenson* (1979), 180 Mont. 269, 275, 590 P.2d 136, 140 (citing *United States v. Matlock* (1974), 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d. 249-50). The State has the burden of showing that the consent was voluntary. *State v. Kim* (1989), 239 Mont. 189, 196, 779 P.2d 512, 517.

¶11     The District Court found that Earl had "common authority to consent to a search of the premises. . . [and] gave that consent voluntarily. . . ." Travis argues that Earl did not have sufficient joint control over the apartment at 59 Frontage Road to consent to the search. We agree. As Travis points out, Earl's residence at 55 Frontage Road and the apartment at 59 Frontage Road are physically separate buildings. Earl lived in his home but did not reside in, and did not have a key to, Travis's apartment. The record reflects that Earl would sometimes enter the apartment to watch television with his son, Scott McLees (Scott), or perhaps to wake Travis for work. Earl testified that he would knock and announce himself before entering the apartment.

¶12     In order to let Deputy Ehlers into the apartment, Earl had to take him around to the back of the building, into the attached workshop and through an unlocked back door to the apartment. Travis had been living in the apartment with Scott, his father, for approximately six months and Scott had given him permission to stay there while he was gone; this was an

agreement Earl was not involved in. Scott paid no rent to Earl and there was no rental agreement. Scott usually resided in the apartment but was out of the state at the time and had left the back door to the workshop unlocked because no one could find a key to it.

¶13 The State argues that Earl's consent was valid because no landlord-tenant relationship existed between Earl and Travis; Travis's living arrangement was with Scott, not Earl, and therefore Earl never relinquished authority or control of the apartment to him. It claims that Travis was a temporary guest in Earl's apartment, that he paid no rent or utilities, and that he lived out of a duffel bag. The State also maintains that a special relationship between a defendant and the owner of an apartment together with no formal landlord-tenant agreement are "important benchmarks" under these circumstances. We note that the cases cited by the State for this proposition are not controlling, and they are distinguishable from the case at bar. None of the cited cases concern one family member renting a separate residence to another, but rather reflect instances where one family member has permitted another to stay in their home as a guest. In all but one case cited by the State, (*Adams v. State* (Okla. Crim. Ct. App. 1982), 645 P.2d 1028)(defendant staying in sister's garage apartment), the owner of the home and the defendant lived together in the same residence. In *People v. Lucero* (Colo. Ct. App. 1985), 720 P.2d 604, also cited by the State, the court relied on the fact that there was no landlord-tenant relationship and no rent paid, referring to the defendant as a "tenant at sufferance." *Lucero* at 606. However, as the United States Supreme Court pointed out in *Matlock,*

6

[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 250 n.7.

¶14    In *Matlock*, the issue before the Supreme Court was whether the third party who had consented to the search of the bedroom where Matlock was staying had a relationship to the room sufficient to make her consent valid against Matlock. The Court found that the third party's consent to search the bedroom was sufficient where; 1) the room bore every evidence that it was also occupied by a woman; 2) she indicated that she and Matlock slept in the bedroom regularly, including that morning; 3) she told police that she and Matlock shared a dresser in the room; and 4) she told police that the women's clothing in the room was hers. See *Matlock*, 415 U.S. at 161-172, 94 S.Ct. at 990-93, 39 L.Ed.2d at 247-50.

¶15    We begin our analysis of whether Earl had authority to consent to the search of the apartment, by noting that Travis claims Earl was coerced into giving his consent. After a review of the record, however, we agree with the District Court that although Earl was possibly intimidated and let Deputy Ehlers into the apartment "on a friendly basis," there is no evidence to suggest his consent was coerced. As a result, we must analyze only whether Earl's consent to the search was valid at the time he permitted Deputy Ehlers to enter the apartment.

7

¶16   In determining that Earl had "common authority to consent to a search of the premises," the District Court relied on the fact that Travis did not pay rent or utilities, did not have a rental agreement with Earl, did not furnish the apartment with his own property, and kept his belongings in duffel bags while his father's personal belongings were in the dresser drawers. Based on these facts, the District Court found that "it is reasonable to conclude that Travis assumed the risk that his grandfather could and would assert his own control over the premises at any time . . . Earl . . . exercised his authority as owner, grandfather, and host to enter the apartment at will regularly for a number of reasons – all known to Travis . . . ."

¶17   We conclude that the evidence in the record is insufficient to show that Earl had common authority over the apartment. Although Earl was the owner of the apartment, and no rental agreement existed between Travis and Earl, these factors do not create "mutual use of the property," or "joint access and control for most purposes," which would create common authority. Earl testified that he never went to the apartment if Scott was not around. He said he did not have free access and would knock before he went in. Earl was obviously not a cohabitant of the apartment, did not share in its use, and could not consent to a search on that basis. Scott was the regular inhabitant of the apartment, and while he may have had joint authority and control to consent to the search, Earl did not. We conclude that it was not reasonable for the District Court to find that Travis "assumed the risk that Earl could and would assert control over the premises at any time." The State failed to meet its burden of

8

establishing that Earl had common authority over Travis's apartment. Unless Earl had other "sufficient relationship" to the apartment, his consent was invalid.

¶18    Earl testified that he, at times, gained access to the apartment in order to visit with Scott or to watch a ball game. The fact that Earl owned the apartment is not dispositive where Travis, who was living in the apartment, had a reasonable expectation of privacy. Assuming Earl had authority to access the apartment for such purposes, it was limited to those activities. *See Sorrenson,* 180 Mont. at 276, 590 P.2d 141 (Authority of neighbor to enter defendant's home to water plants in defendant's absence was not authority to consent to a search of the home). Earl, therefore, did not possess a "sufficient relationship" with the apartment which would give him authority to consent to a search. Therefore, the District Court erroneously concluded that based on these facts, Earl had common authority over the apartment sufficient to consent to the search.

¶19    The State contends that even if Earl did not have authority to give consent, representations made by Earl to the officers at the time of the search support a finding that the officers believed Earl had authority to consent, even if he did not. They maintain that under the doctrine of "apparent authority," a search is valid if consent is given by a person who police reasonably, but mistakenly, believe has joint authority over the premises. This issue was first addressed by the United States Supreme Court in *Illinois v. Rodriguez* (1990), 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148.

9

¶20 In *Rodriguez*, Gail Fischer told police that Rodriguez had assaulted her in a certain apartment in Chicago, Illinois. She referred to this apartment as "our apartment" and said that she had clothes and furniture there. She then traveled to the apartment with police, unlocked the door with her key, and gave the officers permission to enter. The police didn't have an arrest warrant for Rodriguez, or a search warrant for the apartment. Upon entering the apartment, the officers observed drugs and drug paraphernalia and found Rodriguez asleep in the bedroom. There, they discovered more drugs, arrested Rodriguez, and seized the drugs and paraphernalia. After being charged with possession of a controlled substance Rodriguez moved to suppress all evidence seized at the time of his arrest, claiming that Fischer had vacated the apartment several weeks earlier and therefore had no authority to consent to the entry. *Rodriguez*, 497 U.S. at 180, 110 S.Ct. at 2796-97, 111 L.Ed.2d at 155-56.

¶21 Finding that Fischer had no "joint access or control for most purposes," the Supreme Court explained what it called the "general rule" with respect to what is necessary to satisfy the "reasonableness" requirement of the Fourth Amendment:

> [i]t is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government--whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search and seizure under one of the exceptions to the warrant requirement--is not that they always be correct, but that they always be reasonable. . . . [B]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must

10

be those of reasonable men, acting on facts leading sensibly to their conclusions of probability (citation omitted).

*Rodriguez*, 497 U.S. at 185-86, 110 S.Ct. at 2800, 111 L.Ed.2d at 159-60.

¶22 The majority then stated that it saw "no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search," and set forth a test for determining the constitutional validity of a warrantless search pursuant to the consent exception to the warrant requirement:

> determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment. . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? . . . If not, then the warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Rodriguez,* at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (citation omitted).

¶23 Although this Court has previously examined the issue of third-party consent, the doctrine of apparent authority as it applies to third-party consent searches has never been substantively addressed in Montana. Travis argues that the warrantless search of the apartment absent Earl's actual authority to consent violated his rights under the Fourth Amendment of the U.S. Constitution as well as under Article II, Sections 10 and 11 of the Montana Constitution. "Because Montana's unique constitutional scheme affords citizens broader protection of their right to privacy than does the Fourth Amendment to the United States Constitution, we usually need not consider the Fourth Amendment issue." *Hubbel,* 286 Mont. at 211, 951 P.2d at 977. However, because Article II, Section 11 of the Montana

11

Constitution mirrors the Fourth Amendment to the United States Constitution, we analyze most search and seizure questions arising under Article II, Section 11 using traditional Fourth Amendment principles. *Siegal*, 281 Mont. at 264, 934 P.2d at 184.

¶24 Article II, Sections 10 and 11 of the Montana Constitution provide:

> Section 10. **Right of privacy**. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Art. II, Sec. 10, Mont.Const.

> Section 11. **Searches and seizures**. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

Art. II, Sec. 11, Mont.Const.

¶25 To determine whether there has been an unlawful search pursuant to Montana's Constitution, we look to two factors: (1) whether the person has an actual expectation of privacy that society is willing to recognize as objectively reasonable; and (2) the nature of the state's intrusion. *Hubbel*, 286 Mont. at 208, 951 P.2d at 975-76. "At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." *State v. Scheetz*, 186 Mont. 41, 48-49, 950 P.2d 722, 726. "The fundamental purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures is to protect the privacy

12

and security of individuals and safeguard the sanctity of the home against arbitrary invasions by governmental officials." *Dorwart v. Caraway*, 1998 MT 191, ¶ 21, 290 Mont. 196, ¶ 21, 966 P.2d 1121, ¶ 21.

¶26 The State does not claim that exigent circumstances existed which would have prevented Ehlers from obtaining a search warrant prior to the entry and search of Travis's apartment. Courts have indicated the rationale behind the warrant requirement;

> [t]he presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.

*Sorrenson*, 180 Mont at 274, 590 P.2d at 140. The primary purpose of the exclusionary rule is to "deter future unlawful police conduct" by making evidence which the State obtains through a search and seizure in violation of the Fourth Amendment, inadmissable in criminal proceedings. *State v. Pipkin*, 1998 MT 143, ¶ 12, 289 Mont. 240, ¶ 12, 961 P.2d 733, ¶ 12. The result is that in the absence of one of the recognized exceptions to the warrant requirement, a search made without a warrant is unlawful and any evidence which results from the search should be suppressed. *Pipkin,* ¶ 12.

¶27 In adopting the apparent authority rule in *Rodriguez*, the Supreme Court explained what the exclusionary rule provides under the Fourth Amendment;

> [w]hat Rodriguez is assured by the trial right of the exclusionary rule, where it applies, is that no evidence seized in violation of the Fourth Amendment will

be introduced at his trial unless he consents. What he is assured by the Fourth Amendment itself, however, is not that no government search of his house will occur unless he consents; but that no such search will occur that is "unreasonable...."

*Rodriguez*, 497 U.S. at 183-84, 110 S.Ct. at 2799, 111 L.Ed. 2d at 158.

There are various elements, of course, that can make a search of a person's house "reasonable" – one of which is the consent of the person or his cotenant .... Here, we also have not held that the Fourth Amendment requires factual accuracy.

*Rodriguez*, 497 U.S. at 185, 110 S.Ct. at 2799, 111 L.Ed. 2d at 159.

The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Rodriguez*, 497 U.S. at 186, 110 S.Ct. at 2800, 111 L.Ed. 2d at 160.

¶28 In Montana, however, we analyze such a situation in light of our citizens' enhanced right to privacy. "[E]xcept in certain carefully defined classes of cases, a search of property without proper consent is '*unreasonable*' unless it has been authorized by a valid search warrant." *Dorwart*, ¶ 21 (emphasis added). Unlike its federal counterpart, Article II, Section 10 protects against invasions of privacy. Hawai'i, whose constitution also specifically grants the right of privacy to its citizens has declined to follow Rodriguez, based on that constitutional provision. In declining to adopt the doctrine of apparent authority, the Hawai'i Supreme Court stated;

[a]llowing warrantless searches of an individual's home without the consent of someone authorized to give it, absent any exigent circumstances, would fly

14

in the face of this protection. Indeed, an invasion of privacy is no less of an "invasion" if the governmental officials are "reasonable" in their mistaken belief that the third party possesses the authority to consent. This is because, regardless of whether the police acted in good faith, the individual's "privacy" is still invaded when the police search his or her personal belongings without permission.

*State v. Lopez* (Haw. 1995), 896 P.2d 889, 902.

¶29 In *Lopez*, police were called to investigate a robbery at the house of Daniel and Kelly Hauanio. *See Lopez*, 896 P.2d at 893-95. Detective Guillermo, who was assigned to continue the investigation, later telephoned Kelly's mother and told her he wanted to interview Kelly and Daniel and go into the Hauanios' house to continue the investigation. Kelly's mother told Detective Guillermo that the Hauanios were staying at a hotel in Hilo, Hawai'i.

¶30 Without the Hauanios' permission, Kelly's mother volunteered to take Guillermo to the house herself. She met him there and they entered through a closed door which was not able to be locked. While there Guillermo confiscated a cellophane container filled with cocaine which he found on the floor of the master bedroom. Based on this information alone, the police obtained a warrant to search the Hauanios' home. While executing the warrant, police found evidence linking the Hauanios to a large cocaine delivery already under investigation. The circuit court granted the Hauanios motion to suppress the evidence seized by the police, concluding that the state had not established that Kelly granted her mother the authority to consent to Guillermo's entry. Because the entry was without consent, the evidence he recovered from the Hauanio house was suppressed. *Lopez*, 896 P.2d at 896. On

15

appeal, the prosecution conceded that Kelly's mother did not have "actual authority" to consent to Detective Guillermo's entrance into the house, but argued that she had "apparent authority." *Lopez*, 896 P.2d at 899.

¶31   The Supreme Court of Hawai'i declined to adopt the federal concept of apparent authority from *Rodriguez* stating;

> [o]ur willingness to afford greater protection of individual privacy rights than is provided on the federal level arises from "our view [that] the right to be free of 'unreasonable' searches and seizures under article I, section 5 [which later became article I, section 7] of the Hawai'i Constitution is enforceable by a rule of reason which *requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary. . . .*" At this point, we simply cannot say that it is "necessary" to allow third parties to consent to searches of an individual's personal and private belongings when they are devoid of any authority to do so.  Our constitution guarantees more to the citizens of the State of Hawai'i.

*Lopez*, 896 P.2d at 901-902 (emphasis in original).

¶32   Article I, section 7 of Hawai'i's Constitution specifically protects against "invasions of privacy." *Lopez*, 896 P.2d at 897.  We agree with the Hawai'i court's refusal to extend the doctrine of apparent authority based on this right to privacy.  In light of Montana citizens' similar increased right to privacy under Article II, Sections 10 and 11, we now hold that for third-party consent to be valid as against the defendant, the consenting party must have actual authority to do so.  Because Deputy Ehlers' search of Travis's apartment was not consented to by an individual possessing actual authority, the search violated Article II, Sections 10 and 11 of the Montana Constitution.  The evidence seized in that search should be suppressed.

¶33 The State argued in the District Court that if Earl's consent was invalid then the evidence should be admitted under the "independent source" and "inevitable discovery" rules. The District Court did not rule on these issues.

¶34 We reverse the judgment of the District Court as to the evidence obtained in the warrantless search of Travis's apartment and remand to the District Court for a determination of whether the evidence is admissible under the independent source or inevitable discovery rules.

¶35 Reversed and remanded.

/s/ William E. Hunt
_____
Justice

We Concur:

/s/ J. A. Turnage
_____
Chief Justice

/s/ Karla M. Gray
_____

/s/ W. William Leaphart
_____

/s/ Jim B.
_____

/s/ Jim Regnier
_____

/s/ Terry N. Trieweiler
_____
Justices

17

January 11, 2000

CERTIFICATE OF SERVICE

I hereby certify that the attached document was sent by United States mail, prepaid, to the following named:
JACK H MORRIS ESQ
JARDINE AND MORRIS
BOX 488
WHITEHALL MT 59759-0488

HON JOSEPH P MAZUREK ATTORNEY GENERAL
MIKE WELLENSTEIN ASSISTANT
215 NORTH SANDERS
HELENA MT 59620

ROBERT R ZENKER
DEPUTY COUNTY ATTORNEY
BOX 36
VIRGINIA CITY MT 59755-0036

ED SMITH
CLERK OF THE SUPREME COURT

STATE OF MONTANA

BY: _Gallagher_
Deputy