FILED

06/18/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0475

DA 22-0475

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 129

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

NEIL HOWARD LANCHANTIN,

      Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDC-2022-55
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Jeremy S. Yellin, Attorney at Law, Havre, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

      Kevin Downs, Lewis and Clark County Attorney, Fallon Stanton, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  March 29, 2023

Decided:  June 18, 2024

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Neil Lanchantin appeals the First Judicial District Court's order denying his motion to suppress evidence obtained when law enforcement officers entered private property without a warrant. We address the following dispositive issue:

> *Whether the District Court erred by denying Lanchantin's motion to suppress on the basis that Lanchantin had no reasonable expectation of privacy.*

¶2 Lanchantin had a reasonable expectation of privacy in the driveway of the property where he was residing with his girlfriend, which was marked with a "No Trespassing" sign at the entrance to the property. Absent exigent circumstances, the trooper was not allowed to pursue Lanchantin on to the private property he occupied with his girlfriend for a misdemeanor traffic infraction.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 We address the following facts and procedural background pertinent to Lanchantin's motion to suppress:

¶4 On January 28, 2022, at approximately 10:15 p.m., Montana Highway Patrol Trooper Jesse Short was traveling eastbound on Highway 200 in Lincoln, Montana, when Lanchantin pulled his pickup truck out of a parking lot and into the eastbound lane in front of him. As Trooper Short followed Lanchantin through Lincoln and out of town, he estimated Lanchantin exceeded the increasing posted speed limits by approximately 10-15 miles per hour. Trooper Short activated his overhead lights to initiate a traffic stop.

2

Approximately 20-30 seconds after Trooper Short activated his lights, Lanchantin slowed down, turned on his right blinker, and turned right onto K Lazy 3 Road.

¶5     K Lazy 3 Road is a private easement road providing access to several private properties, including the property owned by Lanchantin's girlfriend, Katherine Gardner, with whom he was residing at the time. The entrance to K Lazy 3 Road has no gate; it has a timber arch over the entrance with a cattle guard directly below. There is a green street sign on top of a stop sign where K Lazy 3 Road intersects with Highway 200 that identifies it. Shortly after turning onto K Lazy 3 Road, there is a sign posted to a tree on the left-hand side of the road, facing towards vehicles entering the property, which reads: "Private Property—No Trespassing."[1] Further down K Lazy 3 Road, it veers to the right as it enters Gardner's property. As the road enters Gardner's property, there is another sign posted to a tree on the right-hand side of the road, which reads: "No Trespassing." Written on this sign are the numbers "1901," which is Gardner's address.[2]

¶6     Shortly after Trooper Short turned onto K Lazy 3 Road behind Lanchantin he turned on his siren, but Lanchantin continued down the road until he reached Gardner's residence. During the pursuit, Trooper Short passed both of the "No Trespassing" signs. Trooper

---

[1] Attached to this Opinion are Defendant's Exhibits B and D, depicting the placement of the sign, and Defendant's Exhibit G, which is a close-up of the sign. All three exhibits were admitted into evidence without objection at the suppression hearing. The red circle on Defendant's Exhibits B and D has been added by the Court for clarification.

[2] Attached to this Opinion are Defendant's Exhibit J, depicting the placement of the sign, and Defendant's Exhibit R, which is a close-up of the sign, both of which were admitted into evidence without objection at the suppression hearing.

Short had not previously driven on K Lazy 3 Road and he testified that he did not see either of the signs because he was focused on Lanchantin's truck.

¶7 After stopping, both Trooper Short and Lanchantin exited their vehicles. Trooper Short informed Lanchantin that he stopped him for violating the speed limit on Highway 200. As Trooper Short approached him, Lanchantin gestured towards the building he was parked in front of and stated, "I live here." Trooper Short observed that Lanchantin appeared to be under the influence. After confirming his suspicions, Trooper Short arrested Lanchantin for DUI.

¶8 The State charged Lanchantin with felony DUI, seventh or subsequent offense, and four misdemeanor offenses. Lanchantin moved the District Court to suppress all inculpatory evidence against him. During the suppression hearing, the District Court heard testimony from several witnesses. In addition to Trooper Short, the State called Tanya Kenworthy, Lanchantin's parole officer, who testified that Lanchantin was required to advise her of his current address, and she did not have Gardner's residence as being Lanchantin's address of record.

¶9 Lanchantin called Gardner and Robin Meguire, a neighbor who owns property also accessed by K Lazy 3 Road. Gardner testified that Lanchantin began living with her at 1901 K Lazy 3 Road shortly after Thanksgiving 2021, approximately two months before the night of his arrest. Gardner testified that she owns the 33-acre property on which her residence is located. Gardner testified the two "No Trespassing" signs were present at the time of Lanchantin's arrest and that they were as depicted in the exhibits. Gardner testified

4

that K Lazy 3 Road is a private easement road used by her and three other property owners to access their respective properties. Gardner testified that she purchased the property, in part, because it was secluded and private. Gardner testified that the "No Trespassing" signs were already present when she purchased the property which prompted her to think: "I knew I was in heaven; privacy and no trespassing." Gardner testified that she wrote her address on the "No Trespassing" sign where the road crosses onto her property for delivery drivers when she had ordered items.

¶10 Meguire testified that she purchased a cabin accessible through K Lazy 3 Road as a "private little retreat." She considered the road private property because it was privately maintained, and it was not frequented by the public. Meguire testified that she was aware of the "No Trespassing" signs and noted that the second "No Trespassing" sign was located "right as you enter [Gardner's] property, I would say her driveway from the private drive."

¶11 The District Court denied Lanchantin's motion to suppress on the basis that Lanchantin did not have a reasonable expectation of privacy at the location of the stop. Lanchantin pled guilty to the DUI charge but reserved his right to appeal the District Court's order.

## STANDARDS OF REVIEW

¶12 "We review denials of motions to suppress evidence for whether the lower court's supporting findings of fact are clearly erroneous." *State v. Peoples*, 2022 MT 4, ¶ 10, 407 Mont. 84, 502 P.3d 129 (citation omitted). "A finding of fact is clearly erroneous if it is not supported by substantial credible evidence, if the lower court has misapprehended the

5

effect of the evidence, or if our review of the record creates a firm conviction that a mistake was made." *State v. Smith*, 2021 MT 324, ¶ 9, 407 Mont. 18, 501 P.3d 398 (citation omitted). "We review related lower court interpretations and applications of law de novo for correctness." *Peoples*, ¶ 10 (citation omitted).

**DISCUSSION**

¶13 The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution protect individuals against unreasonable government searches and seizures. "As a procedural component of these protections, government searches and seizures must generally occur pursuant to a judicial warrant issued on probable cause." *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 10, 391 Mont. 457, 419 P.3d 1208 (citing U.S. Const. amend. IV; Mont. Const. art. II, § 11). Article II, Section 10, of the Montana Constitution provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." "We address Article II, Section 10 in conjunction with Article II, Section 11 in analyzing and resolving a search and seizure issue that specifically implicates the right to privacy." *State v. Goetz*, 2008 MT 296, ¶ 14, 345 Mont. 421, 191 P.3d 489 (citations omitted). Article II, Sections 10 and 11, together, "provide a heightened state right to privacy, broader where applicable than the privacy protection provided under the [Fourth Amendment] to the United States Constitution." *State v. Staker*, 2021 MT 151, ¶ 9, 404 Mont. 307, 489 P.3d 489 (citation omitted).

6

¶14    In this case, the dispositive issue is whether Lanchantin's right to privacy and to be free from unreasonable searches and seizures guaranteed by Article II, Sections 10 and 11, was violated when Trooper Short proceeded down a private road beyond a posted "Private Property—No Trespassing" sign, and then proceeded onto a residential driveway beyond another posted "No Trespassing" sign for the purpose of effecting a misdemeanor traffic stop.[3]  In that regard, to determine whether an unlawful government search has occurred, we consider the following factors:

> (1) whether an individual has an actual expectation of privacy;
>
> (2) whether society is willing to recognize that expectation as objectively reasonable; and
>
> (3) the nature of the State's intrusion.

*Smith*, ¶ 17 (citation omitted).

¶15    The State concedes that "[t]he facts of this case are extraordinarily similar to those in *State v. Smith*."  Notwithstanding that concession, the State contends that the dispositive difference is that "[a]t no point during this encounter did Lanchantin demand Trooper Short to leave or get a warrant."  The State contends: "Without this, nothing unmistakably indicated that entry to the property where the stop occurred was prohibited."

¶16    There is no dispute that *after* Trooper Short stopped Lanchantin in Gardner's driveway, Lanchantin did not demand that Trooper Short leave the property.  The

---

[3] It is not necessary to determine whether Trooper Short violated Lanchantin's rights under the Fourth Amendment because our review is not cabined by the Fourth Amendment.  If Lanchantin's Fourth Amendment rights were violated, we would reach the same outcome in this case pursuant to Article II, Sections 10 and 11.  *Smith*, ¶ 16.

determinative issue, then, is whether the two posted "No Trespassing" signs—the first posted along the road shortly after turning onto K Lazy 3 Road and the second posted at the entry to Gardner's driveway—individually or collectively manifested a subjective expectation of privacy that society is willing to recognize as objectively reasonable.

¶17 The State's argument regarding the implication of the two "No Trespassing" signs is threefold. First, the State argues that because the two "No Trespassing" signs were tacked to trees along the side of K Lazy 3 Road, any message conveyed by these signs was reasonably limited to the areas "off the side of K Lazy 3 Road." Second, the State argues that the signs were posted by a previous property owner. Finally, the State notes that on the "No Trespassing" sign posted at the entry to Gardner's driveway, she had written her address number "to help UPS to deliver packages." From this the State asserts, "the only affirmative action taken by Gardner related to the 'No Trespassing' signs indicated an intention to welcome as opposed to exclude."

¶18 Pertinent to this case, we have held that an individual has an actual expectation of privacy when the individual has evidenced the expectation by posting "No Trespassing" or similar signs. *Smith*, ¶ 18 (citing *State v. Bullock*, 272 Mont. 361, 384, 901 P.2d 61, 75-76 (1995)). Relevant to that expectation, Gardner's unchallenged testimony regarding the "No Trespassing" signs was that she expected the signs to communicate exactly what they said. Regarding her purchase of the land and the signs that were already present, Gardner testified: "I knew I was in heaven; privacy and no trespassing. And that's what I found, is a blessing there." The State's argument that the "No Trespassing" signs were inadequate

8

to convey that expectation because they were tacked to trees along the side of the road is unavailing. The entire purpose of a "No Trespassing" sign is to keep unauthorized individuals off your property and to assert your right to privacy. The signs here were posted specifically along the road, facing incoming vehicles and again as the road turns into Gardner's driveway. The right to privacy and to be free of unreasonable searches and seizures is not dependent on buying a separate post to attach a "No Trespassing" sign to.

¶19 The State's ascribed significance to the fact that the signs were already present when Gardner purchased the property is likewise without merit. Gardner testified that when she observed the "No Trespassing" signs on the property, this was a motivating factor for purchasing the property because "privacy and no trespassing" were important to her. Her testimony is consistent with the fact that she left the signs up after purchasing the property. An individual's privacy interest is in their property; the sign is merely an expression of that interest. It is absurd to suggest that Gardner was required to replace the existing "No Trespassing" signs with new "No Trespassing" signs in order to assert her right to privacy.

¶20 Regarding the State's argument that the "No Trespassing" sign posted at the entrance to Gardner's driveway "indicated an intention to welcome as opposed to exclude" because she wrote her address number on it for package deliveries, to the extent that the address number on that "No Trespassing" sign conveyed any information, it was that this "No Trespassing" sign was unambiguously specific to Gardner's property. As to the State's argument that allowing invitees onto your property somehow abrogates the right to exclude anyone else, "[a] person enters or remains unlawfully in or upon any . . . premises

9

when the person is not licensed, invited, or otherwise privileged to do so." Section 45-6-201(1), MCA. A citizen does not sacrifice the right to privacy in their own home by ordering packages from Amazon.

¶21 The State next argues that Lanchantin had no privacy interest in Gardner's home because he did not live there. The State acknowledges that a person's privacy interest in property does not require actual ownership, but the State contends that this interest "cannot logically extend to any individual on any property." But the record does not suggest that Lanchantin was just "any individual" claiming a privacy interest in "any property." Gardner testified that she and Lanchantin had been in a relationship for several months; Lanchantin had begun staying with her regularly approximately two months before the night in question; Lanchantin kept a number of personal items at the residence; and Lanchantin received mail at the residence. In response, the State correctly notes that Lanchantin did not advise his parole officer of a change of address. While this may provide a basis for a violation of Lanchantin's parole—a fact the District Court noted during the suppression hearing—it does not diminish Lanchantin's interest in the residence and his ability to assert a privacy interest. As Lanchantin points out, in both *Smith* and *Bullock*, the defendant seeking suppression did not own the subject property.

¶22 Lanchantin had an actual, subjective expectation of privacy. Trooper Short's DUI investigation took place in the driveway of 1901 K Lazy 3 Road in front of Gardner's residence where Lanchantin was staying. The residence is located on a 33-acre property outside of Lincoln. Although the property was not fully fenced or gated on the night in

question, the residence and driveway is located in a secluded area obstructed from public view and accessible through a private easement road. Upon entering the road, a driver immediately encounters a "No Trespassing" sign. Driving further onto the property, the road veers onto Gardner's driveway that is marked by another "No Trespassing" sign that is specific to Gardner's property.

¶23   "[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by warrant, and that expectation is plainly one that society is prepared to recognize as [reasonable]." *State v. McLees*, 2000 MT 6, ¶ 25, 298 Mont. 15, 994 P.2d 683 (citation omitted). "Society recognizes an actual expectation of privacy as reasonable when a resident makes that expectation 'unmistakably' apparent through 'No Trespassing' signs, gates, *or* by communicating that entry is not allowed." *Smith*, ¶ 21 (emphasis added) (citing *Bullock*, 272 Mont. at 384, 901 P.2d at 76; *State v. Hubbel*, 286 Mont. 200, 209, 951 P.2d 971, 976-77 (1997)). The operative word in that litany of methods by which an expectation of privacy is expressed is "or." As the State acknowledges, "[t]he facts of this case are extraordinarily similar to those in *State v. Smith*." The State asserts the dispositive difference between this case and *Smith* is that "[a]t no point during this encounter did Lanchantin demand Trooper Short to leave or get a warrant." But the only reason it was necessary for the defendant to demand the officer leave or get a warrant in *Smith* was because "neither Smith nor the [owners of the home where Smith was staying] took affirmative action to keep people from coming up the driveway. Once Smith told [the officer] that he was trespassing and told him to

11

obtain a warrant, however, that communication was unmistakable." *Smith*, ¶ 21. In this case, it was not necessary for Lanchantin to tell Trooper Short that he was trespassing because that is what the "No Trespassing" sign was for.[4]

¶24 The dissent accuses the Court of "expand[ing] the narrow holdings of *Smith* and *Lange v. California*, 594 U.S. ___, 141 S. Ct. 2011 (2021)." Dissent, ¶ 34. In reality it is the dissent that seeks to *narrow* these holdings and, consequently, narrow the privacy rights Montanans currently enjoy. Ostensibly relying on *Smith*, the dissent asserts that if a stop begins on a public road, a citizen "implicitly consent[s]" to law enforcement entering his private property for a misdemeanor because the citizen "[brings] the initial encounter onto his property," "[n]otwithstanding the officer's awareness of the reasonable expectation of privacy." Dissent, ¶ 41. First of all, this assertion runs directly contrary to the U.S. Supreme Court's holding in *Lange*, upon which we relied in *Smith*. In *Lange*, the U.S. Supreme Court held:

> The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all circumstances in a pursuit case to determine whether there is a law enforcement emergency. On many occasions, the officer will have good reason to enter [without a warrant]—to prevent imminent harms of violence, destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so— *even though the misdemeanant fled*.

---

[4] Since the stop took place in the driveway of the private property Lanchantin occupied with Gardner, which was marked with a "No Trespassing" sign at its entrance, and was alone sufficient to provide notice that entry was not allowed, *Smith*, ¶ 21, we need not consider the implication of the first "No Trespassing – Private Property" sign along K Lazy 3 Road.

*Lange*, 594 U.S. at ____, 141 S. Ct. at 2024 (emphasis added).  Contrary to the dissent's misconstruction of *Smith* that the mere act of fleeing a misdemeanor is alone sufficient to abrogate a citizen's reasonable expectation of privacy in his own home, that is not at all what we held in *Smith*.  In *Smith*, the officer's entry into the driveway was "implicitly consented" to only because "neither Smith nor the [owners of the home where Smith was staying] took affirmative action to keep people from coming up the driveway."  *Smith*, ¶ 21.  In this case, that affirmative action was taken by the posting of the "No Trespassing" signs, one of the methods we explicitly endorsed in *Smith*.  *Smith*, ¶ 21.  But rather than recognizing the methods for manifesting an actual expectation of privacy that society recognizes as reasonable that we identified in *Smith* as *alternatives*, the dissent endorses a "Privacy-Plus" rule that would allow law enforcement to go past a "No Trespassing" sign—and presumably through a closed or even locked gate—and enjoy carte blanche to conduct an investigation on private property until the citizen takes the *additional* step of verbally instructing the officer to leave.

¶25    The dissent next asserts that "the Court ignores the unique facts of this case." Dissent, ¶ 49.  It is not entirely clear how the dissent views the facts of this case as so unique when even the State concedes that "[t]he facts of this case are *extraordinarily similar* to those in *State v. Smith*"—a case in which we explicitly held that the posting of "No Trespassing" signs are sufficient to manifest an actual expectation of privacy that society recognizes as reasonable.  *Smith*, ¶ 21.

13

¶26 Finally, the dissent criticizes the Court for "provid[ing] no analysis on whether this case presented an exigency." Dissent, ¶ 54. Since the State does not argue there was any exigency, it is not clear exactly what the dissent expects the Court to analyze.[5] Notwithstanding the complete lack of any argument regarding an exigency exception, the dissent asserts that the Court "should still analyze whether an exigency existed . . . in order to refrain from an absurd result." Dissent, ¶ 54. To be clear, the "absurd result" the dissent seeks to avoid is this Court's holding that a "No Trespassing" sign is sufficient to manifest an actual expectation of privacy that society recognizes as reasonable—as we have already explicitly held in *Smith*—and that in such circumstances law enforcement cannot enter onto private property without a warrant "even though the misdemeanant fled"—as the United States Supreme Court held in *Lange*. To avoid this "absurd result," the dissent would have this Court, sua sponte, create, and then analyze, an exigency argument that was never raised by the State, nor factually developed in the record.[6]

---

[5] We decline to address an argument not made on appeal. *See, e.g., State v. Allum*, 2005 MT 150, ¶ 20, 327 Mont. 363, 114 P.3d 233.

[6] The dissent asserts that "[t]his case clearly presented an exigency until, at least, Short could be assured that Lanchantin's flight down a private road not visible from the highway would not lead to 'the escape of the suspect.'" If there was an exigency as "clearly presented" as the dissent believes, it was incumbent upon the State to at least make that assertion, even in the absence of a developed argument. But the State not only failed to make the legal argument for an exigency exception to the warrant requirement, the State never made even the bare factual assertion that an exigency existed or that Trooper Short was concerned about Lanchantin's possible escape.

**CONCLUSION**

¶27　The District Court erred by denying Lanchantin's motion to suppress. We reverse the District Court's Order and remand this matter for further proceedings consistent with this Opinion.

　　　　　　　　　　　　　　　　　　/S/ JAMES JEREMIAH SHEA

We concur:

/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON

Justice Laurie McKinnon, concurring.

¶28　I agree with the Court that, as we expressly held in *Smith*, the placing of a "No Trespassing" sign is sufficient to manifest an actual expectation of privacy, thus necessitating a warrant be obtained prior to entry. Further, in my opinion, this case is indistinguishable from *Lange* which required exigent circumstances to enter a protected area without a warrant when the offender is a fleeing misdemeanant. I write separately to keep our analysis within the framework we routinely employ for evaluating any Fourth Amendment challenge to a search or seizure.

¶29　The ultimate touchstone of the Fourth Amendment is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006). "That standard 'generally requires the obtaining of a judicial warrant' before a law enforcement officer can enter a home without permission." *Lange*, 141 S. Ct. at 2017. However, the warrant requirement

15

is subject to certain exceptions and the State, to justify a warrantless entry into a protected area of privacy, must be able to satisfy one or more of those exceptions. *Lange*, 141 S. Ct. at 2017. "One important exception is for exigent circumstances." *Lange*, 141 S. Ct. at 2017. "It applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable.'" *Lange*, 141 S. Ct. at 2017. "The exception thus enables law enforcement officers to handle 'emergencies'—situations presenting a 'compelling need for official action and no time to secure a warrant.'" *Lange*, 141 S. Ct. at 2017. The exigent circumstances exception is applied on a case-by-case basis and requires the court to examine whether an emergency justified a warrantless entry. *Lange*, 141 S. Ct. at 2017. In *Lange*, the Supreme Court considered whether a person who was attracting attention by playing loud music and honking his horn could be pursued by police onto his driveway and up to his home. 141 S. Ct. at 2016. The Court rejected a categorical rule that flight of a suspected misdemeanant always justifies a warrantless entry into a home. Instead, "[a]n officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency." *Lange*, 141 S. Ct. at 2024.

¶30 Here, there is little question that Lanchantin had an actual expectation of privacy in his driveway and area around his home, particularly because of the placement of two "No Trespassing" signs. In *Smith,* we reaffirmed our rejection of the distinction between curtilage and open fields, "refusing as 'repugnant to our State's explicit recognition of privacy as a fundamental right' a categorical rule that an individual does not have a right

to privacy in open fields." *Smith*, ¶ 17 (quoting *Bullock*, 272 Mont. at 384, 901 P.2d at 75). Thus, we held in *Smith* that "[a]n individual has an actual expectation of privacy beyond the curtilage of his or her home when the individual has evidenced the expectation 'by fencing, [by posting] 'No Trespassing' or similar signs, or 'by some other means [which] indicates unmistakably that entry is not permitted.'" *Smith*, ¶ 18. In *Smith*, we held that Smith telling law enforcement that the officer was trespassing communicated to the officer that he was not permitted to enter. *Smith*, ¶ 20. "This clear invocation of privacy rights demonstrated to [the officer] that Smith had an actual expectation of privacy on the property." *Smith*, ¶ 20, citing *Bullock*, 272 Mont. at 384, 901 P.2d at 76; *Hubbel*, 286 Mont. at 209-10, 951 P.2d at 976.

¶31 The dispute, here, is not whether Lanchantin had an expectation of privacy in the drive approaching the home in which he lived when it was posted with two "No Trespassing" signs—he clearly did have an expectation of privacy under *Smith*, *Bullock*, and our precedent. I agree with the Court's analysis of this point. However, the focus of the instant dispute must be on whether exigent circumstances were present which were sufficient to justify the only applicable exception to the warrant requirement. I would conclude, first, that the State has failed to establish the existence of any exigent circumstances. Indeed, the State has failed to even address exigent circumstances in its briefing. However, regardless, I would conclude that a suspected offender driving 10-15 miles per hour over the speed limit is not an emergency compelling a warrantless search;

17

that is, these circumstances do not present a compelling need for official action and no time to secure a warrant.

¶32　While I agree with much of the Court's analysis, I think it is important to stay focused on the exigency exception to the warrant requirement because only an applicable exception will allow law enforcement to enter an offender's home and protected curtilage when the offender has communicated entry was not permitted. While there may be other cases where the circumstances are not as clear under our precedent that an actual expectation of privacy exists; here, I would not complicate matters for law enforcement pursuing an offender by adding a requirement that, in addition to evaluating the presence of exigencies, they evaluate also whether they are nonetheless entering a protected area of privacy when they pass posted "No Trespassing" signs. Law enforcement's focus should be on whether an exigency exists, as the question of whether they are in a protected space is clear. The Dissent's position is blatantly contrary to the United States Supreme Court, which held in *Lange* that flight, alone, of a misdemeanant is insufficient to justify a warrantless entry. 141 S. Ct. at 2024. Certainly, the "escape of [some] suspects," Dissent, ¶ 54, such as a felony offender, might establish an exigency given perhaps the magnitude of the crime; but the Court in *Lange* specifically rejected the Dissent's proposition that a fleeing misdemeanor suspect, simply by virtue of their flight, could be followed into their home and surrounding protected area. Dissent, ¶ 54. The Dissent's position would allow a warrantless entry into the home and protected surrounding area based on a traffic violation simply because they did not stop. While such a categorical rule might provide

18

clarity for law enforcement, it is a position that was flatly rejected by the Supreme Court as inconsistent with the Fourth Amendment and is, further, an intolerable position given Montana's enhanced right of privacy.

¶33 I would conclude, after acknowledging there was an expectation of privacy, that there was no emergency satisfying the exigency exception to the warrant requirement and would reverse on that ground. I think it is important that we stay focused on the proper steps of the analysis.

/S/ LAURIE McKINNON

Justice Dirk Sandefur joins in the concurring Opinion of Justice Laurie McKinnon.

/S/ DIRK M. SANDEFUR

Chief Justice Mike McGrath, dissenting.

¶34 I dissent. The Court expands the narrow holdings of *Smith* and *Lange v. California*, ___ U.S. ___, 141 S. Ct. 2011 (2021). This expansion incentivizes any person subject to a lawful traffic stop to attempt to elude the officer by finding the nearest private road. The "'act of retreating into [one's] house'" or, as here, driveway can "'not defeat an arrest' that had 'been set in motion in a public place.'" *Lange*, 141 S. Ct. at 2019 (quoting *United States v. Santana*, 427 U.S. 38, 42–43, 96 S. Ct. 2406, 2409–10 (1976)).

¶35 The "determinative issue," as I see it, is not whether "No Trespassing" signs manifest an expectation of privacy that society is willing to recognize as objectively reasonable. Opinion, ¶ 16. Of course they do. *See State v. Bullock*, 272 Mont. 361, 384,

19

901 P.2d 61, 76 (1995). The Court's minimal analysis on the second prong fails to address the unique facts and issues presented in this case. Opinion, ¶¶ 22–23. Rather, the determinative issues are whether society is willing to recognize an objectively reasonable expectation of privacy in that sign when someone is fleeing from a lawful traffic stop and no objective facts indicate to an officer that *that* sign affords *that* specific individual an actual expectation of privacy and whether the State may pursue a suspect on that private road to effectuate a lawful traffic stop initiated on a public road. I believe an appropriate reading of *Lange* and *Smith* answers these questions and should lead us to affirm the District Court. The Court instead focuses its analysis on our longstanding and undisputed holding that "No Trespassing" signs alone—without the additional facts presented by this case—indicate an objectively reasonable expectation of privacy. *Smith*, ¶ 21.

¶36 Further, we must address when police may expand the scope of the initial traffic stop when the person has fled down a private roadway that does end up being theirs. I contend that an officer may expand the initial traffic stop (subject to other constitutional protections) until objective facts indicate to the officer that *that* person holds an expectation of privacy in the property that society recognizes as reasonable, which never occurred here.

¶37 The United States Supreme Court decided a very narrow issue in *Lange*: no categorical rule is justified which allows police to always enter the home of a fleeing misdemeanant.[1] *Lange*, 141 S. Ct. at 2024. Rather, in each case:

---

[1] Montana law precludes an arrest in a private dwelling at night for a misdemeanor committed at some other time and place unless an arrest warrant has been issued. Section 46-6-105, MCA. This statute is not at issue here because the misdemeanor did not happen at another time or place—

20

An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency. *On many occasions, the officer will have good reason to enter*—to prevent imminent harms of violence, destruction of evidence, *or escape* from the home. But when the officer has time to get a warrant, he must do so—even though the misdemeanant fled.

*Lange*, 141 S. Ct. at 2024 (emphasis added). As such, because the California Court of Appeals had established a categorical rule, the United States Supreme Court vacated the opinion and remanded for consideration of whether the facts of that particular case involved an exigency—the Court made no comment on those particular facts.

¶38 We decided *Smith* after the Court's holding in *Lange*. There, Smith was driving 17 miles an hour over the speed limit when he passed an officer. *Smith*, ¶ 2. The officer activated his lights and turned around to pursue Smith. *Smith*, ¶ 2. Approximately 21 seconds after he activated his lights, Smith turned into his 350-foot driveway (without any "No Trespassing" signs posted) and parked next to his garage. *Smith*, ¶¶ 2–3. The officer pulled in behind Smith and advised him that he had been speeding. *Smith*, ¶ 4. Smith informed the officer that he was on private property and requested that he return with a warrant. *Smith*, ¶ 4. The officer did not leave; instead, he asked Smith for his driver's license and registration. *Smith*, ¶ 5. Eventually—only after Smith had asserted his right to privacy, provided verification that he had a right to be on the property, and the original stop for speeding should have ended—the stop ripened into a DUI investigation. *Smith*,

---

Lanchantin's flight from a lawful traffic stop took the police down the driveway, he did not enter the dwelling, and the stop ripened into a felony DUI.

¶¶ 5, 28. The State charged Smith with four misdemeanors, including DUI and speeding. *Smith*, ¶ 6.

¶39 We first considered whether Smith had a reasonable expectation of privacy in his driveway. *Smith*, ¶ 10. We applied our framework to determine if an unlawful search has occurred under Article II, Sections 10 and 11, of the Montana Constitution: (1) whether an individual has an actual expectation of privacy (2) that society is willing to recognize as objectively reasonable and (3) the nature of the State's intrusion. *Smith*, ¶ 17. We noted that one method of asserting an actual expectation of privacy beyond the curtilage of a home is to post "No Trespassing" signs that unmistakably indicate that entry is not permitted. *Smith*, ¶ 18 (citing *Bullock*, 272 Mont. at 384, 901 P.2d at 76).[2]

¶40 However, we held that Smith had not taken similar measures with his property that gave warning to the officer not to enter the property. *Smith*, ¶ 19. Only once the officer got out, Smith clearly communicated that entry was not permitted, and the officer had "*confirmed* that Smith had just arrived at his own home" was the officer aware that Smith had an actual expectation of privacy in the land, which we recognized as reasonable. *Smith*, ¶¶ 20–21 (emphasis added).

---

[2] In *Bullock*, we held that Peterson's expectation of privacy was reasonable where he had moved his cabin further from the road to where it was barely visible, had a fence and a large metal gate that controlled access to his property, posted "No Trespassing" signs on either side of the gate, and members of the law enforcement community had previously requested permission to enter his land. *Bullock*, 272 Mont. at 384, 901 P.2d at 76. Thus, under the specific circumstances of the case, where officers had entered his land with no exigent circumstances or warrant to conduct an investigation of potential illegal game harvesting, the entry was unlawful and the evidence was suppressed. *Bullock*, 272 Mont. at 365, 384–85, 901 P.2d at 64, 76.

¶41   Notwithstanding the officer's awareness of the reasonable expectation of privacy, we agreed with the State under the third prong that the nature of the State's intrusion was initially appropriate and reasonable. *Smith*, ¶ 22. The officer originally acted appropriately by pursuing Smith's vehicle into the driveway under his reasonable belief that Smith was aware he was being pursued for a lawful traffic stop from a public road. *Smith*, ¶ 22. We distinguished *Bullock*, where law enforcement entered the property to conduct an investigation, with *Smith*, where the officer merely entered the driveway to effectuate a traffic stop that he had initiated on a public road. *Smith*, ¶ 22. We further held that "Deputy Monaco's *initial questions to ascertain who lived at the home . . . were minimally intrusive and necessary* to inform him whether he should continue or seek a warrant for further investigation." *Smith*, ¶ 22 (emphasis added). The officer only needed a warrant or an exception to the warrant requirement after Smith had explicitly invoked his right to privacy and the officer had expanded his investigation beyond the scope of the initial stop. *Smith*, ¶ 22. Otherwise, Smith had "implicitly consented"[3] to the officer following him down the driveway by failing to pull over on the public road where the officer first attempted to stop

---

[3] This is unique from the implicit license police might ordinarily have to walk up to a front porch and knock when owners have not taken any steps to protect the property from casual visitors. *Compare City of Whitefish v. Large*, 2003 MT 322, ¶¶ 16–17, 318 Mont. 310, 80 P.3d 427, *with Bullock*, 272 Mont at 384, 901 P.2d at 75–76. Society's recognition of the expectation of privacy as reasonable is case dependent and hinges on the unique facts of each situation. *Large*, ¶ 16. Society reasonably recognizes an expectation of privacy when "No Trespassing" signs are posted such that a casual visitor or a police investigation pertaining to other matters would not be welcome. *See Bullock*, 272 Mont. at 384, 901 P.2d at 76. Society would not recognize a reasonable expectation of privacy in a private road that a fleeing misdemeanant has turned down (absent at least some objective indication that the misdemeanant actually resides there and no exigency exists). *See Smith*, ¶ 22.

him and instead brought the initial encounter onto his property.[4] *Smith*, ¶ 22. Thus, the officer's initial stop, investigation, and all evidence collected—up until Smith had asserted an objectively reasonable expectation of privacy and the officer had expanded his intrusion—was lawful and not subject to a warrant or an exigency. *Smith*, ¶¶ 22, 29.

¶42 As to the officer's expanded DUI investigation, we held that the State needed to show an exigent circumstance, which is a circumstance "'that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Smith*, ¶ 24 (quoting *State v. Wakeford*, 1998 MT 16, ¶ 24, 287 Mont. 220, 953 P.2d 1065). We noted *Lange's* holding that exigent circumstances, including hot pursuit, must be considered on a case-by-case basis considering the totality of the circumstances. *Smith*, ¶ 26. We held that the officer was not able to expand his investigation beyond the initial traffic stop because the State had presented no evidence of any risk that Smith would escape (as the officer had already been able to confirm that Smith resided at the house), harm the officer or another, destroy evidence (as the officer had not

---

[4] Remarkably, the Court never addresses this third prong or distinguishes *Smith's* holding that it was appropriate for the officer to pursue Smith down his driveway in its analysis, which lends to its expansive ruling. At a minimum, our caselaw supports that Short acted reasonably and appropriately by pursuing a vehicle onto private land upon a reasonable belief that Lanchantin was aware that he was being stopped for a traffic stop initiated on a public road. *Smith*, ¶¶ 22, 29 (focusing on suppression of evidence collected only *after* Smith asserted his right to privacy). Pursuing Lanchantin down the private road and driveway was a minimal intrusion necessary to at least determine "whether he should continue or seek a warrant." *Smith*, ¶ 22.

24

yet observed any indicia of impaired driving or developed particularized suspicion of DUI until well after Smith had invoked his right to privacy), or other information that the officer was unable to secure a warrant. *Smith*, ¶¶ 27–28.

¶43 Here, the Court unreasonably expands *Lange* and *Smith*. Unlike in *Smith*, the officer here never received any objective indicia to show that Lanchantin had an actual expectation of privacy in the residence or the private road leading up to it. The Court's holding would make it so that any person (absent some unspecified exigent circumstance beyond fleeing) would be able to avoid a lawful traffic stop by merely pulling down a private road marked with "No Trespassing" signs—regardless of whether the officer can establish that the road is a private driveway belonging to the subject of the traffic stop. *See Santana*, 427 U.S. at 42–43, 96 S. Ct. at 2409–10; *Smith*, ¶ 31 (Rice, J., Specially Concurring) (explaining that the officer was permitted to follow Smith down his driveway because the incident had begun on a public roadway and, at that point, the officer had no indication that the driveway actually led to Smith's residence and citing *Lange* for the proposition that "[a] person's privacy interests do not extend to *any* private property.").[5]

---

[5] Numerous other courts have similarly held that a person invites the police to the location when they lead officers to private property after a lawful traffic stop has been initiated on a public road. *See, e.g.*, *State v. Hernandez*, 244 Ariz. 1, ¶ 19, 417 P.3d 207 (2018) ("The officers' entry onto the driveway to effectuate a traffic stop that began on a public road does not change the analysis because Hernandez effectively invited them there [by implied consent]."); *United States v. Zabokrtsky*, No. 5:19-cr-40089, 2020 U.S. Dist. LEXIS 39056, *12 (D. Kan. March 6, 2020) (holding no suppression necessary when defendant led officers to his driveway after they had initiated a stop for a cracked windshield, and the police were entitled to proceed with the stop as if it were a standard roadside stop, including a dog sniff and warrant arrest that police had no probable cause for until after the stop); *see also Lange*, 141 S. Ct. at 2017 n.1 (collecting cases).

¶44 I would hold similarly here. After observing a vehicle speeding on a public roadway, Short activated his lights. Lanchantin failed to pull over and, 20–30 seconds after Short had activated his lights, pulled into a private road marked with "No Trespassing" signs. At this point, Short had probable cause to stop Lanchantin for speeding and for fleeing from or eluding a peace officer in violation of § 61-8-316, MCA. As in *Smith*, Short should be allowed to follow Lanchantin up the roadway to complete the initial stop and to determine—at a minimum—that Lanchantin actually resided there and was not attempting to escape. *See Smith*, ¶ 22.

¶45 Additionally, Short testified, and the District Court found, that "Trooper Short did not see any no trespassing sign as he pursued the fleeing white truck." Given that the stop occurred at approximately 10:15 p.m. in January, when Short was closely pursuing a fleeing vehicle on a snow-covered dirt road, and the signs were posted off the road on trees, it was not clear error for the District Court to credit that testimony and conclude that Short acted properly in pursuing Lanchantin past the "No Trespassing" signs. *See State v. Phillips*, 2013 MT 317, ¶¶ 20–21, 372 Mont. 317, 312 P.3d 445 (concluding that officers' entry into the wrong driveway was proper when they had not seen the posted addresses).

¶46 Regardless of whether Short saw the "No Trespassing" signs, Lanchantin had no *reasonable* expectation of privacy. *Smith*, ¶ 22. Short had initiated a lawful traffic stop on a public roadway and Lanchantin failed to pull over. Moreover, he potentially committed a new offense by fleeing. *See* § 61-8-316, MCA (fleeing or eluding a police officer is generally punishable by up to a year in jail and up to a $2,000 fine). Montana law also

26

makes it a crime to willfully fail or refuse to comply with a lawful order or direction of a peace officer. Section 61-8-105, MCA. Certain circumstances, like those present here, diminish a person's reasonable expectations of privacy—such as when "an individual is already on notice . . . that some reasonable [and minimal] police intrusion on his privacy is to be expected" and "when the search constitutes a minimal intrusion." *Maryland v. King*, 569 U.S. 435, 447, 133 S. Ct. 1958, 1969 (2013); *State v. Spady*, 2015 MT 218, ¶ 26, 380 Mont. 179, 354 P.3d 590. Neither Smith nor Lanchantin could harbor any reasonable expectation that their driveways would remain free of police pursuit when they have committed a crime and failed to yield to a lawful traffic stop initiated on a public road. Similar to an arrestee, a person fleeing from a lawful traffic stop has a diminished expectation of privacy in where they lead the officer. *Cf. Spady*, ¶ 27. Importantly, the officers here and in *Smith* only minimally intruded in the privacy of their driveways rather than following them into a garage or house. *Smith*, ¶ 22. Their failure to stop on the public roadway was "the product of an essentially free and unconstrained choice" not influenced by police coercion, which waived any rights they might have had in the privacy of their driveway. *State v. Laster*, 2021 MT 269, ¶ 40, 406 Mont. 60, 497 P.3d 224 (internal quotation omitted).

¶47 We have concluded in other situations that someone waives an actual expectation of privacy in their home under the first prong, or that the expectation was not reasonable under the second prong. We consider these questions on a case-by-case basis considering the totality of the circumstances. For example, in *Estate of Frazier v. Miller*, 2021 MT 85,

¶ 25, 404 Mont. 1, 484 P.3d 912, we held that Frazier did not have an actual expectation of privacy in his residence notwithstanding that "'it is in one's home where one has the greatest expectation of privacy.'" *Frazier*, ¶ 25 (quoting *State v. Bassett*, 1999 MT 109, ¶ 37, 294 Mont. 327, 982 P.2d 410). There, Frazier had called 911, telling dispatch that there would be a suicide at his home. *Frazier*, ¶ 4. Officers arrived to investigate and, after being unable to assess the situation from outside, opened the door a few inches. *Frazier*, ¶ 5. "Frazier responded, yelling at the officers that they did not have the right to be there, to close the door, and to get out of the house and go away." *Frazier*, ¶ 5. The officer then fully opened the door—reaching inside of Frazier's residence—after being unable to obtain a warrant or consent to enter. *Frazier*, ¶ 6. Eventually, Frazier was shot and killed. *Frazier*, ¶ 6. His estate filed a constitutional tort claim alleging that by opening the front door and breaching the threshold of the residence, the officer had conducted an unconstitutional search and seizure and unconstitutionally invaded Frazier's privacy. *Frazier*, ¶ 7. After discussing the community caretaker doctrine, we analyzed whether Frazier even had an actual expectation of privacy in his residence under the specific facts of that case. *Frazier*, ¶ 25. We held that Frazier's 911 call demonstrated that he did not have an actual expectation of privacy at his residence at that time because he had initiated the call, his statements demonstrated an expectation that law enforcement would respond, the officers had a duty to investigate, and the nature of their intrusion was slight— notwithstanding the fact that the home is where one has the *greatest* expectation of privacy

and in many other situations the officer's actions would be per se unreasonable and require a warrant or an exigency. *Frazier*, ¶ 25.

¶48 In another circumstance, we held that someone did not have a reasonable expectation of privacy in their fenced, obscured, and secluded backyard when they were blaring loud music at night and officers arrived to investigate a noise complaint. *State v. Dunn*, 2007 MT 296, 340 Mont. 31, 172 P.3d 110. There, officers arrived in front of the house and saw that it was dark but that noise and smoke was coming from behind the house. *Dunn*, ¶ 5. Officers went around back, asked for identification from Dunn (who was responsible for the party), ran his name through dispatch records, arrested him for an outstanding warrant, and found a marijuana pipe upon his arrest. *Dunn*, ¶ 5. We affirmed the district court's denial of Dunn's motion to suppress because "'[s]ociety's recognition of the expectation of privacy as reasonable hinges on the unique facts of each situation.'" *Dunn*, ¶ 13 (quoting *Large*, ¶ 16). Thus, *given the circumstances*, Dunn did not have a reasonable expectation of privacy in his backyard and the nature of the police intrusion was minimal. *Dunn*, ¶¶ 14–17. We found it "improbable that society is willing to accept a privacy expectation as 'reasonable' where the individual uses his property to disturb the peace of others at 4:00 a.m. in the morning" where he was committing a very public act. *Dunn*, ¶ 14.

¶49 Here, the Court ignores the unique facts of this case and only cites to general rules that private residences and "No Trespassing" signs generally provide reasonable expectations of privacy. Opinion, ¶ 23. As discussed above, unique factual circumstances

29

can occur which can (1) waive an actual expectation of privacy in a person's residence that they would normally have (*see Frazier*, ¶ 25); (2) cause an actual expectation of privacy to become one that society is not willing to recognize as objectively reasonable (*see Dunn*, ¶ 14); or (3) notwithstanding an objectively reasonable expectation of privacy, the police intrusion might be minimally necessary such that no warrant or exigency was required (*see Smith*, ¶ 22).

¶50 This case presents another unique situation where the general rule must yield—both because it is improbable that society is willing to recognize a reasonable expectation of privacy in a private driveway that someone has entered to evade a lawful traffic stop initiated on a public road, and because the nature of the State's intrusion in this case was minimal and necessary. After Lanchantin finally stopped, Short had reasonable latitude to request proof of identification, his address, and an explanation of his actions regarding the speeding and eluding. *Smith*, ¶ 22 (citing *City of Missoula v. Kroschel*, 2018 MT 142, ¶¶ 14–15, 391 Mont. 457, 419 P.3d 1208). Lanchantin got out of his vehicle after he parked. Based on his slurred, mumbled speech, balance issues, and confusion, Short was "very sure he was impaired." This suspicion came about quickly and gave Short reasonable latitude to follow up on. *See State v. Noli*, 2023 MT 84, ¶ 35, 412 Mont. 170, 529 P.3d 813. Nothing indicates that Short delayed in obtaining facts from which he could determine that Lanchantin had a privacy interest in the driveway and should thus seek a warrant for an expanded investigation. *Compare Smith*, ¶ 28 (explaining that the officer did not have an exigent circumstance to continue investigating a possible DUI that was suspected only

*after* the officer had confirmed that Smith lived at that residence and had invoked his right to privacy). The record shows that Short conducted a timely investigation into the initial reasons (which along with speeding now included eluding) for the stop. His observations during the initial conversation provided probable cause that Lanchantin was driving under the influence. The facts here are distinguishable from *Smith*.

¶51  When Lanchantin initially stopped, he demanded that Short tell him who had reported him, and they went around in circles on that issue. After Lanchantin had settled down, Short asked for license, registration, and proof of insurance—all of which are permissible and proper to request for a speeding and fleeing violation. *Smith*, ¶ 22. Lanchantin was unable to provide these documents. After providing several incorrect spellings of his name, Short was finally able to find Lanchantin in the system and learned that his license was revoked and his vehicle was required to have an interlock device on it. Additionally, the system showed that his address was different than where Lanchantin had stopped, giving further indication that this may be exactly the kind of wild-goose chase discussed in *Smith* that led us to conclude the officer properly followed Smith down his driveway. *Smith*, ¶ 22. At no time was there any objective indicia that Lanchantin actually lived there or could assert a right to privacy besides his statements that he stayed there occasionally. Holding that Lanchantin's self-serving gesture and proclamation that "I live here" is enough to force Short to exit the property and obtain a warrant is not supported by

31

our Constitution or caselaw. Opinion, ¶ 7; *accord Smith*, ¶ 31 (Rice, J., Specially Concurring).[6] The record supports the District Court's conclusion that:

> Through the entirety of the stop, the only indication Trooper Short had that Lanchantin may have had any right to be on the property was Lanchantin's own statements that it was his girlfriend's house, he lived there[,] and if he was not going to jail, he would just go inside.

Until Short had objective facts that indicated Lanchantin resided there and could invoke his privacy rights, he was able to follow up on his investigation. *Smith*, ¶ 22.

¶52 The Court acknowledges the State's argument that a privacy interest cannot logically extend to any individual on any property. Opinion, ¶ 21. The majority responds that "the record does not suggest that Lanchantin was just 'any individual' claiming a privacy interest in 'any property.'" Opinion, ¶ 21. However, its citation to record facts

---

[6] It is also against officer training for the very same reason—as shown in the transcript of the suppression hearing:

> [Attorney]: And are there times when even if it's going onto private property, you are trained that you should continue in pursuit?
>
> [Short]: Yes, ma'am. [When] I do not know whose private property that is.
>
> [Attorney]: Okay. And at this point, did you know that [Lanchantin] belonged on that property?
>
> [Short]: No, ma'am.
>
> [Attorney]: All the way through the conclusion of your investigation, whether you had seen that sign or not, do you have any independent knowledge *other than his own statements* that this property belonged to him or that he had a right to be there?
>
> [Short]: No, I do not.

(Emphasis added.)

32

come *only* from facts made known at the suppression hearing which were never known to the officer until the suppression hearing. "In a suppression hearing, a court must consider the totality of the circumstances. 'In evaluating the totality of the circumstances, a court should consider the quantity, or content, and *quality or degree of reliability*, of the information *available to the officer*.'" *State v. Bauer*, 2001 MT 248, ¶ 28, 307 Mont. 105, 36 P.3d 892 (quoting *State v. Gilder*, 1999 MT 207, ¶ 11, 295 Mont. 483, 985 P.2d 147) (emphasis added); *cf. State v. Duong*, 2015 MT 70, ¶¶ 13–14, 378 Mont. 345, 343 P.3d 1218. Not without due diligence, the officer never gained any objective or reliable indication during the traffic stop that Lanchantin was not just "any individual" trying to claim a privacy interest in "any property." Indeed, the majority's holding that "the trooper was not allowed to pursue Lanchantin on to the private property he occupied with his girlfriend for a misdemeanor traffic infraction" leads to the absurd result that officers must stop at any "No Trespassing" sign that a fleeing misdemeanant hides behind even when no facts indicate to the officer that *that* individual has a privacy interest in *that* property, directly contrary to our holding in *Smith*. Opinion, ¶ 2. During the stop, Lanchantin provided no objective indication that he actually lived there: he did not enter the garage (*see Lange*); he did not provide a license with that address or corroboration (*see Smith*); he did not enter the residence or do anything else except state that he lived there. In fact, the facts that came to light during the stop indicated exactly the opposite: his driver's record and parole restrictions showed a different address, the vehicle he was driving was not registered to that address, and nobody on the property ever came out to verify he was

lawfully on the private property. *Contra Smith*, ¶ 32 (Rice, J., Specially Concurring) (explaining that Smith's friend, whose license showed that location as his address, buttressing Smith's claim of residence was enough to put the officer on notice that he needed a warrant or exigency to initiate a new investigation). The Court relies solely on facts established months later at the suppression hearing to justify its expansive holding. Instead, it should be focused on the totality of the circumstances as they existed at the time of the stop including the quantity and quality of information known to the officer to establish whether society is prepared to recognize Lanchantin's expectation of privacy as reasonable, or that the nature of the officer's intrusion was minimal, where he did not pursue Lanchantin inside a garage or house but merely pursued him to the end of the driveway that Lanchantin led him down.

¶53     The facts here do not establish that Short could be secure in Lanchantin's continued presence at that location while he sought to obtain a warrant. Indeed, the reasonable conclusion Short could have made at that time was that Lanchantin had finally arrived at a dead end during his flight from a lawful traffic stop. Without additional facts, no exigency or warrant was required. Short should be allowed to follow Lanchantin down a private road to effectuate a lawful stop that was initiated on a public road (and any other particularized suspicion that was developed within the lawful scope of the initial stop) until he has facts, under the totality of the circumstances, that Lanchantin had an actual expectation of privacy in *that* property that society is willing to recognize as reasonable. *Smith*, ¶¶ 17, 22; *Noli*, ¶ 35.

¶54 Even if Lanchantin has an objectively reasonable expectation of privacy and Short unnecessarily intruded on it by pursuing the fleeing Lanchantin down his driveway, the Court provides no analysis on whether this case presented an exigency. I agree with the Court that we *generally* decline to address arguments not made before the district court or on appeal. Opinion, ¶ 26 n.5; *State v. Dickinson*, 2008 MT 159, ¶ 20, 343 Mont. 301, 184 P.3d 305. The State focused its arguments on the fact that Lanchantin did not have a reasonable expectation of privacy at that time under these circumstances—as I would conclude. If, as the Court holds without analysis, Lanchantin did have a reasonable expectation of privacy and the nature of the government intrusion was excessive, then it should still analyze whether an exigency existed—notwithstanding the lack of argument from the parties—in order to refrain from an absurd result. *See, e.g.*, *Dickinson*, ¶¶ 20–24 (engaging in legal analysis of the inevitable discovery doctrine without any argument from the parties). This case clearly presented an exigency until, at least, Short could be assured that Lanchantin's flight down a private road not visible from the highway would not lead to "the escape of the suspect." *Smith*, ¶ 24; *Wakeford*, ¶ 24; *Lange*, 141 S. Ct. at 2021. Short did what was necessary to address the traffic offense and repeatedly redirected Lanchantin's ramblings to the necessity of identifying him. Without that identification, Short could not complete the purpose of the stop or verify Lanchantin's association with the property to be assured Lanchantin would not escape.

¶55 I dissent. This case is distinguishable from *Smith* and *Lange* and leads to a result that neither caselaw, the United States Constitution, nor Montana Constitution demand.

/S/ MIKE McGRATH

Justices Jim Rice and Beth Baker join the dissenting Opinion of Chief Justice McGrath

/S/ JIM RICE
/S/ BETH BAKER